We're going to turn the gavel over to Judge Rory. Thank you, Chief Judge. I understand you have a motion to make? Yes, I do. Bill, would you stand? I move the admission of J. William Toth, who is a member of the Barons of Good Standing in the Highest Court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualification. And I'd just like to say on a personal note, because we've worked together for a year now, what an honor and pleasure it's been to have Bill in our chambers. And I'm particularly happy because he's staying in D.C. when he leaves, which makes me very happy that he'll continue to remain an important part of what we do. So I would move his admission. Well, that's certainly a well-supported motion. I don't want to hear a bop. I'm going to ask my fellow panel member for a vote. I have no reason to object. I happily join, in fact. We grant the motion and we ask you to step up and take the oath. Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, of that case, and of all this law, and that you will support the Constitution of the United States of America? Yes, I do. Welcome to the Bar of the United States of America. Thank you. Congratulations. Congratulations, Bill. Thank you. Now, the first case for argument is 17-1617, Netless v. Sandusk. Mr. Lloyd will direct. Thank you, Chief Judge Croson. May it please the Court. The Board erred by holding Netless' claims unpatentable based on a theory of unpatentability that was never disclosed in the petitions or institution decisions. Yet even without that error, the Board's decision should not stand because, on the critical issue here of motivation to combine with a reasonable expectation of success, the Board accepted conclusory assertions without adequate explanation or support. I know you're asking for reversal here. That's fine. But you're also asking an alternative to vacate and remand. Doesn't it seem a little odd? If we vacated and remand because you're saying that you didn't have adequate notice and that they raised new arguments or a new theory, all that happens is it goes back to the Board and they affirm it. I mean, doesn't that kind of prove that there's a question as to why we're even here dealing with this juncture? Two responses on that, Chief Judge Croson. I think the alternative for vacating and remand would only be to go back under the original theory. I don't think it would be proper for the Court to send it back to address Sandusk's new theory. Well, why is that? I mean, isn't this a notice problem? And, in fact, I mean, one could argue, as your friend does on the other side, that you did have appropriate notice here and an opportunity to respond. But if that's your right, then why don't we go back and do a do-over and give you an opportunity to respond? Are they precluded from doing this at this juncture, or is it just that you didn't have an adequate opportunity to respond? They are precluded. It is a notice problem, but the AIA sets out a very particular regime in how notice must be given. It requires a petition that identifies with particularity the claims challenge, the grounds for each challenge, and then the evidence supporting that challenge. The Board institutes review pursuant to the petition. The patent owner has to file a response to the petition. But it includes evidence. You're not allowed to put on any evidence? Is the petition perceived through the process? Yes, you are allowed, of course, to develop evidence, and the AIA makes that clear. But what you can't do is you can't change the ground of unpatentability, and that's what cases like Newvasive and American have held, is that when a party changes the thrust of its theory such that it's no longer standing behind the petition, that's an improper new theory. That's a question of law for this Court. It's not a question of fact that the Board gets to decide, as the Board seems to think. Well, I don't know how to define theory. There are no cases, are there, that are on point to this? I mean, grounds can include whether it's obviousness or anticipation. It can include combining these three references versus these three other references. So there are lots of different things that could get mixed up in terms of what's been in it. And I think the cases that you cite and the cases where this Court has had a problem with changes through the proceeding really deal with the Board reliance on a different piece of prior art or a different aspect of that prior art in reaching its decision, right? So, yes, that is some of what happens in those cases, but that's also what happened here. And there are cases on point, Chief Judge Prost. Both the In Re Newvasive case that we cite and the American case that we cite both held that the Board had adopted a new theory. And Newvasive likens it to what this Court has seen for decades in the law of reexaminations, that the Board can't adopt a new ground of unpatentability. And the new ground of unpatentability in the reexam context isn't just switching from obviousness to anticipation. It can be a new ground of unpatentability even when it's relying on the same references and the same statutory basis. I thought in the reexamination context the Board is allowed to do a new ground of unpatentability. That would just mean the patent owner has a right to reopen prosecution if he wants to. That's right. So there are two parts to that, Judge Chenwright. The first question is whether there was a new ground, which I think was what Chief Judge Prost was asking about. And then the second is, what are the proper procedures? So in the reexam context, the statute does allow the Board to adopt new grounds, unlike the AIA. The IPR context is different. Just so I understand, I understand how reexam works. Let's just go to how the AIA works. Is it your view that the petitioner and the Board are confined completely to just whatever is in the petition and the institution? They're confined in terms of the claims that can be challenged and the grounds of that challenge. That's what SAS held, Judge Chen. Right. But I guess we also have a handful of cases, including Genzyme, for example, that articulates an understanding and recognition that there is going to be some give and take throughout one of these so-called trials. And so, therefore, there's going to be more evidence that gets developed and introduced, and possibly even some supplementation, I'll call it, to what the original grounds of unpatentability were. And so, therefore, the Board does have some discretion in permitting petitioners to say things in replies that are different from what was said in the petition, and as long as the patent owner has notice and opportunity to respond. So what is wrong with that? I mean, right now we're outside of this case a little bit, but I'm just trying to understand why doesn't the Board have the flexibility, if it chooses to, to accept a reply that says something different from an institution decision and petition, so long as the patent owner does have that opportunity to file a surreply or something else. So I agree we are outside of this case a little bit because I don't think that is exactly what happened here. The Genzyme case wasn't a case about the petitioner trying to raise a new theory. It was about new evidence, and it's expected that evidence can be developed during an AIA, but what you can't do is you can't shift to a new theory or a new ground of unpatentability. That is, I think, clear from the Supreme Court's holding in SAS, that the AIA puts a limit not just on the petitioners but on the Board itself. What the Supreme Court said was that the AIA makes the petition the centerpiece of the proceeding before and after institution. Now, the issue in SAS was whether the Board can decide less than what was in the petition, but I think it's equally clear that the Board can't decide more than what's in the petition. The entire proceeding is based on what the petitioner has put in its petition, and this Court has said that in cases like Illumina. So why does the petitioner get to say anything more during the proceeding? If it can't diverge at all from anything that's already in the petition, then they just go to sleep. Why do they have a right to put in any more paper or declarations or argument with respect to their case? So our position isn't as narrow as that they can't do anything. They can continue to develop evidence that supports their original theory of unpatentability. So in this case, if Sandisk and its petitions had identified that its theory involved modifying the prior art in ways that the art doesn't expressly disclose, if its theory had identified that it was relying on the JEDEC specifications to support that modification, then it could have continued to develop evidence during the trial and present that to the Board in support of its ground. But what it can't do is what it did here, and what was rejected in both Amerikam and In Re Innovasiv, as an improper new theory, not just new evidence, but an improper new theory. And that improper new theory involved where the petition said, we're just relying on the express disclosures of Decatur and Connolly. Now the petitioner's reply said, no, we're not relying on the express disclosures. A person with skill in the art would know they have to modify the circuit. They have to introduce additional logic to introduce a new signal and use that new signal. That's an improper new theory. That was the holding in Amerikam. You also can't rely on... Is there a case from this court that says when an IPR reply does something different from the petition? The petition said, obvious in view of references A and B. And then the reply says, oh, well, in view of what I just saw in the patent owner response, it's really A in view of B and reference C. And then the Board says, that's okay. I'm going to allow that because the patent owner has an opportunity to file a SIR reply or something like that. And then affirms or issues an unpatentability decision in view of references A, B, and C. Is there a Federal Circuit decision that said that is improper to do? I think the In Re Nuvasiv decision comes the closest to those facts. And in fact, the change there was even more subtle than what you suggested. In Nuvasiv, what happened is the petitioner in its petition identified the grounds of unpatentability and the specific art. But it never identified figure 18. It identified other figures within the patent, but never identified figure 18 as the basis for the particular disputed element. Then in its reply, for the first time, it said figure 18 is relevant. And the Board relied on that in its final decision. And like here, the patent owner asked the Board to both strike it, to strike the petition, the reply as improper, and asked in the alternative to submit a SIR reply. And then they were denied the opportunity to file a SIR reply. And they were denied. And that was the problem with that outcome in that case, right? It was the failure to permit the patent owner to file a SIR reply. That's not what the decision said, Your Honor. The decision said that the problem was that the Board had adopted a new theory of unpatentability. Without giving the other side an opportunity to file a SIR reply? Without adequate notice and an opportunity to respond. So the Court didn't go into detail about whether on the Court remanded the issue, but it didn't specify whether on remand the Board would be allowed to consider the new theory. And in other cases, like in the Marikam case, when the Court did find a new theory, the Court remanded only under the original theory, just like the relief we're asking here. But I do want to also fight the premise that if this were to go back under the new theory to give us an opportunity, that the outcome would be the same. And in fact, it wouldn't be. It wouldn't be, at least because we would have opportunity to present additional argument and evidence. But also the Board's... Well, at least argument, you did have an opportunity. Not only did you have an opportunity, but you did. I mean, in the patent owner's response, you had time to consider this new, I don't know, which was a declaration or deposition or whatever. And you cited that. You said, this is what we think the theory is. That's wrong. But even if, you know, accepting this new information or new evidence we have in cross-examination, and then you responded to that so-called new theory, right? That was the Board's reasoning, Chief Judge Gross, but that's wrong. When we filed our petitioner response, the only thing that we knew is that Sandus' expert in his cross-examination had disclaimed his earlier testimony. And so we relied on his change in testimony to discredit him, which is what you do when a witness changes their story. We didn't know... Well, I have a, maybe it's wrong, Appendix 352. And even if these, you argue about what he said, and you said, even if these modifications were to solve the inoperability, Moore is still required to establish obviousness. That's pushing back on his so-called revised theory, right? That's right. So we had cross-examined him. We discredited him for changing his story. And then we also took on the merits. But Sandus' theory continued to evolve because in its replies, then it continued, it newly relied on arguments about a supposed finite number of predictable solutions, which the Board cited in its final decision, which was not something that we had any notice of or opportunity to respond to either. Can I ask you just a little bit, slightly different question? This is back to the SAS kind of question. In your view, is it okay, therefore, for the patent owner to offer, I'm sorry, for the petitioner in its petition to describe alternate theories? Because there's an estoppel... In your view, estoppel would still apply to both theories, right? So estoppel would apply because he could have reasonably raised a different theory. So what is the petitioner to do? How do we resolve this problem, if you're right? Which is, are you allowed, is the petitioner allowed to come forward with alternate theories and the Board then has to institute on all of those theories because that's what SAS told us? What the statute says is the petitioner has to identify with particularity every claim challenged and every ground supporting that claim. And what this court said in Illumina is that puts an obligation on petitioners to put their affirmative case in the petition. And what the court said in Ariosa is that the reply has to be limited to a true rebuttal role. That's not what happened here. That's a violation of the APA and a violation of the AACM into my rebuttal time. Thank you. Okay. May it please the court, Netlist's principal argument on appeal rests on a false premise that Sandisk's reply was an attempt to cure some defect in the prima facie case of obviousness set forth in the petition. There is no defect in Sandisk's prima facie case, and at most this is a run-of-the-mill dispute about the factual question of whether a person of ordinary skill in the art would have had a reasonable expectation of success in combining the references to arrive at the claim to mention. And the board resolved that factual issue in Sandisk's favor. How do we pronounce your expert's name? I've been pronouncing it Jaganathan. I don't know if it's correct. Why would Dr. J in his declaration say that it would be obvious to use the chip select signal's output from the Takeda bank control unit as the logic signal to enable the bit switches? Why would he say it like that? Well, when you put the emphasis on the logic signal to enable the chip select switches, well, I think the board found, as a matter of fact, that that was inartfully drafted. In fact, the proposed combination as set forth in the petition was that a person of ordinary skill in the art would recognize the utility of the chip select signal. In the petition, we said that the enablement of Connolly's FET switch would be based at least on that signal or would be relative to which of those signals were selected. But the prima facie case of obviousness in the petition never said you take Takeda's chip select signal and apply it directly to Connolly. No, it says based on at least the chip select signal. But I'm just trying to figure out why your expert, Dr. J, would say it like this. What am I supposed to make of this? So what Dr. J was doing was providing the actual implementation details. And when he was deposed on that, he unambiguously, right off the bat, clarified, I didn't mean that you would take the signal and apply it directly to the FET switch. I am absolutely saying that you use that signal as the logic signal that's used to enable the FET switch. You just have to put in an appropriate delay. If he had said, gee, I misspoke, if he had fessed up that, yes, I said something and I was wrong, would that be a problem for you then? Absolutely not, because then what NETLIS would be entitled to do would be to test that proposition through deposition and then use that deposition testimony to argue perhaps that Dr. Jaganathan's declaration testimony is not credible or to use that testimony and say, well, now what he's saying, that would be beyond the capability of a person of ordinary skill in the art. And in fact, that's precisely what NETLIS did. And then the board has to evaluate that evidence. Can I ask you, we use a lot of words here. So there's grounds and we all thought we knew, we think we know what that means. What word would you put on this thing that Dr. Jay was talking about? Would you call that a theory, his theory of the case? How would you characterize what we're talking about here in terms of the chip signal and what he said? I would characterize it as an implementation detail that supports the... So is it a theory? No. Is it an underlying aspect of a theory? It is evidentiary support for the prima facie case that's set forth in the petition that says that a person of ordinary skill in the art would have recognized the utility of Decatur's chip-select signal in enabling Connolly's bit switches. So that is evidence supporting the theory of unpatentability that is sitting in the prima facie case of unpatentability that's sitting in the petition. It's the petition that governs here, both in the statute and in this court's cases. Not the evidence supporting the petition. Yeah, but you're still bound by it. I mean, that still has to carry some way. That's what the patent owner is in theory relying on, part and parcel. He's not just responding to the petition. He's responding to the evidence supporting the petition, as he should be. As Netlist, in fact, did in this case. They drilled right down to that statement in Dr. Jay's declaration. They probed him on that. At best, that statement was inartfully drafted, but they probed him on that. They tested it. They responded in their patent owner response and said all of those things. They say, well, under his original implementation details, it would have been inoperable. But under what he's saying now in the declaration, that would have been beyond the capability of the skilled artisan. And in fact, because he's all over the place, you should discredit his testimony. Netlist did precisely what it was supposed to do, but it can't claim that it did not have notice of his implementation details. And the board found... Do you agree, right? Does the petitioner then get a reply to the patent owner's response? Yes. And so, if this had come in later in the process, and in fact, they had not had an opportunity in the absence of getting another surreply or something to respond, would you agree under those circumstances, if the board had relied on it, there would be a problem here? I don't think so, because this entire new theory ground, which is in fact not a new theory. It's a response to their patent owner response. The contention of the parties is set forth in the petition. And the petition did not say, take the chip's blood signal, plug it directly into Connolly's FET. It just said... And all it had to do... In the prima facie case, you are obligated to say that a person of ordinary skill in the art would have had a reasonable expectation of success in arriving at the claimed invention. And the petition did that, and it said... It went beyond that, or explained that, and said, this is how a person of ordinary skill in the art would do it. They would recognize the utility of the chip select switch here, and use that, and based on that, enable Connolly's FET switches. Now, the evidence supporting that, Netlist was entitled to test. I think what may also be dispositive here is the fact that there is no daylight between the board's articulation of its unpatentability ground in the final written decision, and Sandisk's articulation of its prima facie case in the petition. There's no daylight between those two. And, again, this is a... Connolly teaches not only the use of bit switches to enable different memory devices, but also teaches the idea of that ASIC logic element for enabling the bit switches themselves, right? That's right, and Connolly also deals with the timing. So, through the logic element, it's not just a command signal that's directly enabling a switch. It's through the ASIC logic element that's doing it. Is that right? Yes, that's right. So, Connolly basically uses two of those logic signals that are called out in the claim. The claim calls out a number of logic signals. It calls out a chip select signal, a bank address signal, a... I guess the point I'm trying to make is if you're going to use the teachings of Connolly and Takeda, you wouldn't necessarily just be using the bit switch by itself, because Connolly teaches the ASIC logic element that provides logic for enabling Connolly's bit switches. So, you would use both of those things together in modifying Takeda's memory module. Yes, Connolly relies on two logic signals, RAS and CAS, row access strobe, column access strobe. Dr. Jay said, well, you could also use the chip select signal. And all three of those signals are called out in the claim, and the claim does not require the use of any one of them. It leaves that to a person of ordinary skill in the art. I want to address this notion that Sandisk was not put on notice of the use of the JEDEC specification in Sandisk's petition. And, in fact, even in the institution decision. And if you go to Sandisk's petition, you cannot separate Ground 2 from Ground 1. Ground 2 relies on Ground 1 to teach most of the elements of the claim. And when you look at Appendix 202, for example, in Sandisk's petition, at the middle of the page it says, because JEDEC provides the standards for implementing an overall DDR-SDRAM architecture, a person of ordinary skill in the art would have consulted JEDEC when designing and implementing the concepts taught in Takeda. And then below that it says, JEDEC is a product data sheet designed to inform a user about the electrical requirements for DDR-SDRAM dual inline memory modules, including the various signals, input signals, output signals, operating conditions, etc. And then for Ground 1, again the petition explains, and this is at Appendix 205, exactly how you would use JEDEC's chip select signal to achieve the selective electrically coupling limitation in Claim 1. It says how you would do that. And it says how you would do it with Takeda as well. And then in the institution decision, the board also, this is at Appendix 270, when it gave a short overview of JEDEC, it said in the institution decision, JEDEC is a product data sheet describing electrical requirements for DDR-SDRAM dual inline memory modules as existed in 2002. And it illustrates the configuration of these models, the data signal lines, data strobe lines, row and column access signals, bank access. The board unambiguously recognized the applicability of the JEDEC standard and put that list on notice that that standard was relevant at a minimum as background art, but also as part of the prima facie case. So there's no notice issue here with respect to how Dr. Jaganathan used the JEDEC specification and how the board used the JEDEC specification. At the bottom here, you're dealing with a limited group of references. There's not a new reference. You're dealing with one ground, which is obviousness. It's not a new ground, such as anticipation, written description. No, not at all. I mean, I think the ground of obviousness is Takeda and JEDEC and Connolly, at least for Ground 2. Ground 2, the use of Connolly here cured the defect that the board found with Ground 1 and the switch not being actually on the memory device. I'm happy to address any additional questions that the panel has. If not, I'll... Thank you. Thank you. Just a couple short points, Your Honor. First, there's no basis here for holding that an expert's testimony on cross-examination that contradicts his earlier testimony is somehow notice. The AIA requires that the agency give adequate notice, and the APA requires the agency, and the AIA says how that adequate notice must be given. It's in the petition. So whatever the expert said on his cross-examination, that can't be noticed if the court agrees that there was a new theory. Now, the board twice asked for briefing on this question, right, during the proceeding? Just once, Your Honor. Okay. Well, they obviously, on the one hand... There were observations submitted, and then later the party submitted legal briefings. Okay. On the one hand, that enters to your benefit because it looks like the board took this issue seriously. On the other hand, they went against you. So... Yes, but, Your Honor, it's a legal question, and Newvasive makes that clear. Whether it was a new ground or new theory is a legal question. Whether the board complies with APA requirements is a legal question. Judge Lurie, to your point about new grounds, the change here is indistinguishable from the change in Illumina. In Illumina, the party argued there was a motivation to combine in the petitions based on specific references, particularly based on the express disclosures, that the conditions in one of the references a person of skill in the art would have expected to succeed. On reply, they then argued, no, in fact, once the patent owners explained why those conditions wouldn't work, they said, well, a person of skill in the art would have known how to modify the conditions to make it work. This court called that a new ground, and it affirmed the board in refusing to consider that, and that's consistent with the way the court treats the same issue in the re-exam context when it determines whether there's a new ground. The question is really whether there was, in fact, a new theory here, whether it was in the petition all along, given that the petitioner and Dr. Jay called out Connolly, and not only Connolly's bit switches, but Connolly's logic element for enabling the bit switches. And so why wouldn't it be the most logical reading of all of that, that you're also using some kind of logic to enable the bit switches in the combination with Decatur? Because that's not, in fact, what the petitions and institutions decisions said, and that's certainly not what the experts said in his report. Here are some of the quotes. He said, quote, the chip selects output from the decode circuitry, referring to Takeda, are the enable signal for the FET switches. That's 4330. He said that a person of skill would have included Connolly's bit switches so that, quote, they would be enabled or disabled by the chip selects output by the Takeda logic. That was repeated over and over in his claim charts, in his declaration. Those were cited affirmatively by Sandisk in its petitions and by the board. That was the theory that we had to respond to. That theory changed. That's an error under the APA and the AIA, and the court should reverse. Thank you. We thank both sides for their cases. Thank you.